BRENT GRAMANZ, INDIVIDUALLY AND DBA RENO SOUVENIR STATIONS, APPELLANT, v. T-SHIRTS AND SOUVENIRS, INC., A NEVADA CORPORATION; JOHN ILIESCU, JR., RESPONDENTS.

No. 24834

April 27, 1995                                    894 P.2d 342

*Henderson & Nelson* and *Robert C. Vohl* and *James M. Walsh,* Reno, for Appellant.

*Prezant, Mollath and Costello,* Reno, for Respondents.

---

## OPINION

*Per Curiam:*

The primary thrust of this appeal challenges an award of damages arising from the breach of a non-competition clause in a contract. Also challenged were the district court's findings that appellant breached the parties' covenant not to compete and that the parties' agreements prohibited appellant from selling his stock until the debt of respondent T-Shirts and Souvenirs, Inc. is retired. We conclude that only nominal damages are warranted because no evidentiary basis exists for the $345,000 damages award entered by the district court. In all other respects we affirm the judgment entered below.

### FACTS

In 1988, appellant Brent Gramanz approached respondent Dr. John Iliescu, Jr. regarding the possible purchase of a souvenir store in downtown Reno. Gramanz had previously managed souvenir stores and, at the time, managed a retail souvenir store and a wholesale outlet from which he could supply the prospective souvenir store "at cost." Iliescu had experience in real estate transactions but had no prior experience in the retail business. Because of Gramanz's souvenir retail experience and the advantages apparent from supplying the prospective store at wholesale prices, Iliescu agreed to enter into a contract with Gramanz to purchase the site.

On June 30, 1988, Gramanz and Iliescu formed respondent T-Shirts and Souvenirs, Inc. ("T-Shirts"), a Nevada corporation, for the purpose of operating a souvenir retail store in downtown Reno. T-Shirts obtained a $900,000 loan from Valley Bank (now Bank of America) with Iliescu and Gramanz jointly and severally liable on the loan; Iliescu and Gramanz also each contributed secured loans of $350,000 to the corporation. The loan agreement with Valley Bank provided that any material change in management or control of T-Shirts would give the bank the right to accelerate payment of the loan.

A stock agreement and a management agreement between Iliescu and Gramanz provided that Gramanz would be primarily responsible for T-Shirts' general operations. These agreements also contained a covenant not to compete directed only at Gramanz, but allowed Gramanz to continue his wholesale souvenir business and his retail souvenir store. Paragraph 11 of the stock agreement provided that if Gramanz violated the covenant not to compete, Iliescu "may, upon 30 days notice to [Gramanz]

purchase all of [Gramanz's shares]'' for $640 per share or a revalued price to which the parties could subsequently agree.[1]

On January 30, 1992, Gramanz entered into a commercial lease for space in a downtown Reno parking garage just a few blocks from T-Shirts in order to build and open a gift store. Iliescu later learned of the lease and met with Gramanz on March 4, 1992, to discuss the latter's intentions. At this meeting, Gramanz expressed his interest in possibly opening a gift store, indicating that he had forgotten about the covenant not to compete or was uncertain as to the scope of the covenant. The new lease executed by Gramanz provided that the premises could only be used for a gift store; however, Gramanz claimed that the lessor had agreed to allow him to sublet the premises for any reasonable use.

Convinced that Gramanz intended to violate the stock agreement, Iliescu had his lawyer send Gramanz a letter providing formal notice of Iliescu's intent to exercise his right to purchase Gramanz's shares of stock as provided in Paragraph 11 of the stock agreement.[2] The letter also indicated that ''upon your transfer of shares to Dr. Iliescu the stock agreement, by its terms, terminates, and you will not be prohibited from opening your new proposed business.'' Gramanz responded to the letter by request-

---

[1]Paragraph 11 of the stock agreement provides in part:

It is specifically agreed that should stockholder Brent Gramanz, in exercising his responsibility for the general operation of the corporation's business . . . engage in any . . . conduct which is intended to profit or benefit said stockholder at the expense of and to the detriment of the corporation, as described in [the Covenant Not to Compete], stockholder John Iliescu, Jr., may, upon thirty (30) days notice to stockholder Brent Gramanz purchase all of the shares of the corporation held by stockholder Brent Gramanz for the sum of $640.00 per share, or any value per share which may subsequently be agreed upon pursuant to the provisions of Paragraph 2 above. Upon such notice to stockholder Brent Gramanz and payment of the purchase price, stockholder Brent Gramanz shall transfer to stockholder John Iliescu, Jr., all of the shares he holds in the corporation.

[2]Iliescu's letter provided in part:

In addition to the legal remedies the corporation may have, as you are aware, Paragraph 11 of the Agreement provides that should you engage in conduct described in Paragraph 10 (the covenant not to compete), Dr. Iliescu as a stockholder may, upon thirty days notice to you, purchase all of the shares of the corporation you hold for the sum of $640.00 per share. Accordingly, this letter constitutes thirty days notice to you pursuant to provisions of Paragraph 11 of the Stock Agreement of Dr. Iliescu's intent to purchase all of your shares in the corporation for the sum of $640.00 per share.

ing a revaluation of the stock pursuant to Paragraph 2[3] of the stock agreement. Shortly thereafter, Iliescu informed Gramanz that he had requested T-Shirts' accountant to proceed to revalue the stock.

Claiming reliance on the belief that Iliescu had unequivocally invoked his right to purchase Gramanz's stock as evidenced by the letter from Iliescu's attorney, Gramanz proceeded to develop the leased property into a souvenir shop. Between April and July of 1992, Gramanz obtained a loan, constructed and began stocking Reno Souvenir Station ("RSS"). Iliescu, on the other hand, insists that the claim of detrimental reliance by Gramanz is belied by his signing of the RSS lease and investing in the property for the new store prior to the March 4 meeting, as well as his reaction to the March 5, 1992 letter from Iliescu's attorney.

Iliescu also claims that the March 5 letter only invoked his right, but not his obligation, to purchase the stock from Gramanz. Iliescu and Gramanz subsequently discussed mutually investing in RSS; however, Gramanz always linked Iliescu's participation with the creation of a 20-year lease on property Gramanz was renting from Iliescu.

On August 5, 1992, Iliescu filed a complaint against Gramanz for breach of contract, breach of fiduciary duty, and injunctive relief, alleging that the opening of RSS would violate Gramanz's covenant not to compete. The district court promptly issued a temporary restraining order enjoining Gramanz from opening RSS.

As a result of the restraining order idling his $500,000 investment, on September 2, 1992, Gramanz sold RSS to a long-time friend, Ronald Drury. Two days later, the district court enjoined Gramanz from competing against Iliescu, but approved the sale of RSS to Ronald Drury at Gramanz's cost.

At the conclusion of a bench trial, the district court found that the language of Paragraph 11 of the stock agreement meant that, despite giving an advance 30-day notice, Iliescu still had the option to purchase Gramanz's shares. The court also found that since no agreement for the purchase of Gramanz's stock existed, Iliescu was not obligated to purchase the stock and that, consequently, no waiver of the covenant not to compete had occurred. As a result of the foregoing findings, the district court concluded

---

[3]Paragraph 2 of the stock agreement provides as follows:

> 2.1 The present value of the stock, as determined by the Corporation and the Stockholders, is $640 per share.
> 2.2 The Stockholders and the Corporation may redetermine the value of the stock at the end of any fiscal year during the duration of this Agreement, and this Agreement shall be amended upon such reevaluation to reflect the new stock value determined.

that Gramanz had violated the covenant not to compete by preparing to open RSS and putting a competing business into the stream of commerce.

Although several persons testified concerning the possible competitive effect of RSS on the business of T-Shirts (from 0 percent to 50 percent), Iliescu provided no expert to testify on the subject. T-Shirts' CPA compared T-Shirts' sales during the period of January to May of 1993 with the company's sales during the period of January to May of 1992 and then extended this figure to determine the annual percentage. Based upon this calculation, T-Shirts showed a 5.52 percent decrease in its 1993 annual gross sales. Gramanz's expert witness testified that the RSS opening had no measurable negative impact on T-Shirts and that any demonstrable decrease in T-Shirts' sales since the opening of RSS was reflective of the area's economy during the harsh winter of 1993.

Apparently, by rounding off T-Shirts' 5.52 percent decrease in sales, the district court concluded that T-Shirts experienced a 6 percent drop in annual sales due to competition from RSS. The district court then calculated T-Shirts' damages by multiplying the 6 percent decrease in T-Shirts' sales times the value of T-Shirts ($1,028,000) times the estimated number of years remaining on the Valley Bank loan (5.6 years). This resulted in a $345,000 damages award against Gramanz.

Finally, as to the duration of the parties' relationship in T-Shirts, the district court concluded, "there is an ambiguity that arises when the Stock Agreement, Management Agreement and loan documents with Valley Bank are construed together, which is necessary as they are integral pieces of the same transaction." The district court found that the documents and evidence revealed the parties' intent to remain in the partnership until the initial $1.6 million (Valley Bank loan of $900,000 plus $350,000 each from Iliescu and Gramanz) was retired. Thus, the district court prohibited Gramanz from selling his stock until the corporate debt was retired.

## DISCUSSION

*Whether the district court erred in finding that Iliescu did not waive his right to enforce the covenant not to compete.*

To establish a waiver, the party asserting waiver must prove that there has been an intentional relinquishment of a known right. Mahban v. MGM Grand Hotels, 100 Nev. 593, 596, 691 P.2d 421, 423 (1984). A waiver may be implied through conduct evidencing an intent to waive a right, or conduct that is inconsistent with any other intention than waiver. *Id.*

Gramanz argues that the letter of March 5, 1992, from Iliescu's attorney, which provided formal notice of Iliescu's intent to exercise his right to purchase Gramanz's stock in T-Shirts, waived Iliescu's right to enforce the covenant not to compete. Gramanz insists that no further contractual agreement to sell his stock was required according to Paragraph 11. Because the legal effect of the purchase of Gramanz's stock would be to release him from the covenant not to compete, Gramanz claims Iliescu should be held to have waived the right to enforce this covenant. Furthermore, Gramanz claims that he detrimentally relied on Iliescu's representations, investing $500,000 in the development of RSS because he legitimately believed that he would be released from his covenant not to compete.

We conclude that the district court did not err in finding that Iliescu did not waive his right to enforce the covenant not to compete. The March 5 letter provided in part, "obviously, upon *your transfer of shares to Dr. Iliescu* the stock agreement, by its terms, terminates, and you will not be prohibited from opening your new proposed business." (Emphasis added.) Moreover, Paragraph 11 of the stock agreement provides in part that Iliescu "*may,* upon thirty (30) days notice" purchase all of the shares held by Gramanz. (Emphasis ours.) Furthermore, the provision does not provide any time within which Iliescu was required to purchase the stock.

In addition, Paragraph 10 of the stock agreement states, "[s]o long as Stockholder Brent Gramanz is the owner of any share or shares of stock in the Corporation, he shall not engage in any commercial, personal, or business activity which is in conflict with the business of the Corporation . . . ." Thus, irrespective of an intent on the part of Iliescu to purchase the shares on March 5, substantial evidence supports the finding that any relinquishment of Iliescu's rights to enforce the covenant not to compete came upon purchase of the shares, not the invocation of the right to purchase the shares.

Because Gramanz continued to own stock in T-Shirts, his actions with regard to putting RSS into the stream of commerce constituted a violation of the covenant. For these same reasons, we conclude that substantial evidence supports the district court's conclusion that Iliescu did not knowingly relinquish his right to enforce the covenant not to compete.

*Whether the district court erred in determining damages.*

This court has held, "evidence going only to the fact of diminution in value alone will not, [without 'an evidentiary basis

for determining a reasonably accurate amount of damages'], establish a basis for an award of substantial damages." Mort Wallin v. Commercial Cabinet, 105 Nev. 855, 857, 784 P.2d 954, 955 (1989).

Iliescu claims that substantial evidence supported the trial court's conclusion that competition from RSS resulted in T-Shirts' declining sales. Iliescu points to the deposition testimony of Gramanz and of T-Shirts' on-site manager, Mr. Burkhardt, stating their expectations that RSS would have a negative impact of between 10 and 50 percent on T-Shirts' gross sales. At trial, T-Shirts' accountant, although unable to specify the actual harm caused by the competition, surmised that part of the 5.52 percent decrease in sales was likely attributable to the opening of RSS. Iliescu claims that the referenced testimony takes the 6 percent figure that was ultimately used by the district court out of the realm of speculation.

We conclude that substantial evidence does not support the court's determination that competition attributable to RSS negatively affected T-Shirts' sales by 6 percent. The deposition testimony of Gramanz and Burkhardt constitutes speculation not supported by evidence. See Advent Systems Ltd. v. Unisys Corp., 925 F.2d 670, 682 (3d Cir. 1991) ("a verdict may not be based on speculation, whether the testimony comes from the mouth of a lay witness or an expert"). Moreover, both of these witnesses testified at trial that based on Burkhardt's promotional efforts and the sales data, they believed that RSS had no impact on T-Shirts' business. The testimony provided at trial and the evidence of T-Shirts' sales compared to the sales of RSS at best provide nothing more than evidence of diminution in T-Shirts' value. This evidence does not, however, provide the required evidentiary basis for determining a reasonably accurate award of damages. See Mort Wallin, 105 Nev. at 857, 784 P.2d at 955.

Moreover, Iliescu provided no expert or equally competent testimony to allow the trial court to establish the required basis for an award of substantial damages. See id. We therefore conclude that T-Shirts is entitled only to nominal damages.

*Whether the district court erred in forbidding Gramanz to sell his T-Shirts stock.*

Gramanz contends that the parties' stock agreement adequately and unambiguously specifies the steps a stockholder must follow in order to sell his or her stock. He notes that extraneous evidence cannot be introduced to explain an unambiguous written contract. *See* Crank v. Nev. Indus. Comm'n, 100 Nev. 80, 84, 675 P.2d

413, 415 (1984). Thus, he claims that the district court erred in finding the effect of the combined agreements to be ambiguous and in using parol evidence to interpret their meaning.

We conclude that substantial evidence supports the district court's conclusions. The district court properly evaluated the various documents forming T-Shirts. Because a sale of Gramanz's stock could drastically affect T-Shirts' loan, and no provision in the agreements provides for such an event, the district court logically found that there was an ambiguity in the agreements. Given this ambiguity, the district court properly looked to parol evidence to determine whether the parties intended the stock to be freely transferable at any time. *Id.*

Both Iliescu and his attorney testified that the stock agreement was intended to prohibit the parties from selling their stock until the debt was paid. Furthermore, Gramanz's managerial acumen and business connections, and Iliescu's lack of the same, substantially support the conclusion that the parties intended less than free alienability of the stock.

We have considered all other arguments raised by the parties and conclude that they are meritless.

For the reasons discussed above, we vacate the award of damages against Gramanz and remand this matter to the district court with instructions to amend the judgment to provide an award of only nominal damages. In all other respects, the judgment of the district court is affirmed.