OPINION
 

 Per Curiam:
 

 SUMMARY
 

 This case addresses, among other issues, Nevada’s Uniform Trade Secrets Act (the “UTSA”), codified at NRS 600A.010-.100. The underlying dispute arose in 1990, when Michelle Frantz (“Frantz”), a sales manager for Johnson Business Machines (“JBM”), a Las Vegas distributor of plastic gaming cards, decided to seek employment with JBM’s card manufacturer, Plastic Graphics, Inc. (“Plastic”). Plastic was owned by Wesley Ru (“Ru”) and Antonio Accornero (“Accornero”); Ru and Accornero also owned a badge and button business called Western Badge & Trophy (“Western”) (hereinafter collectively referred to as “appellants”).
 

 After Frantz’s departure from JBM, its profits spiraled downward. Because JBM believed Frantz had stolen its “trade secrets”
 
 *460
 
 to assist Plastic in misappropriating JBM’s customers, JBM filed suit against appellants seeking compensatory damages, punitive damages, and attorney fees and costs based on numerous causes of action.
 

 After a bench trial, the district court awarded JBM compensatory damages, punitive damages, and attorney fees and costs. Appellants filed this timely appeal alleging several instances of error. We conclude that the district court erred in calculating compensatory damages and in failing to consider NRS 600A.050(2) before awarding punitive damages. We therefore vacate the district court’s award of compensatory and punitive damages, and reverse and remand this matter for recalculation of damages.
 

 FACTS
 

 JBM is a family-owned business founded by Charles R. Johnson (“Charles”) in Las Vegas, Nevada. JBM sold printed plastic cards with personalized embossments that were purchased by casinos and used as VIP and slot machine player tracking cards.
 

 In 1987, Charles hired Frantz as a salesperson for JBM. Frantz was an at-will employee and was not required to sign a covenant-not-to-compete contract. Charles testified that he taught Frantz everything about the plastic card business. Eventually, Frantz was promoted to sales manager of JBM. In addition to Frantz, JBM had two other employees: Charles’s wife, Barbara Johnson, and machine manager Steve Larsen (“Larsen”).
 

 Throughout the years, Charles testified that he and Frantz developed a trusting relationship, and Charles gave Frantz keys to the offices, security codes to the building, and access to customer and pricing lists. Charles further testified that the aforementioned customer information and pricing lists were secured in file cabinets and protected as a trade secret. Charles’s testimony was corroborated by John Luogo (“Luogo”), vice president of sales for another plastic card company, who stated in his deposition that bid and pricing information and customer lists are proprietary, confidential information in the plastic card industry.
 

 According to Charles, another confidential aspect of JBM’s business was the fact that JBM did not manufacture the plastic cards that it sold. In order to protect this confidential information, JBM required Plastic, its manufacturer, to ship the cards directly to JBM where the cards were relabeled and reboxed before being distributed to JBM’s casino accounts. Additionally, Charles testified that before JBM entered into a contract with Plastic to manufacture JBM’s cards, Accornero, an owner of Plastic, orally promised Charles that he would not solicit JBM’s customers
 
 *461
 
 under any circumstances. This was an alleged promise that Accornero would eventually break.
 

 In October 1990, Accornero hired Frantz as a salesperson and began competing against JBM in the plastic card industry. Frantz testified that after she began working for Plastic, she went to several hotels to talk to people with whom she had established a rapport. Frantz further testified that she sent out numerous letters and faxes announcing that she now worked for Plastic, the “direct representative of the manufacturer” and that she could offer “more competitive pricing and guaranteed delivery times.”
 

 Shortly after Frantz’s departure, Larsen contacted all of JBM’s customers to try to establish a business rapport and to inform them that Frantz had left JBM. Larsen testified that he had difficulties with the purchasing representatives of some casinos and that they were ‘ ‘negative or hostile.’ ’ Larsen further testified that after Frantz left, JBM lost approximately 40% of its card sales and 30% of its machine sales to Plastic. Moreover, Larsen testified that although he did not see Frantz take any customer or pricing lists, several lists were missing after Frantz’s departure.
 

 In October 1990, Frantz received the Riverboat, Showboat, and Harrah’s accounts by underbidding JBM. Thereafter, Frantz was served with notice that JBM was seeking a temporary restraining order (“TRO”) to prevent her from directly soliciting JBM’s customers. The TRO was granted and became effective November 7, 1990. Frantz testified that post-TRO she never contacted any of JBM’s customers to solicit their business. However, Frantz further testified that she followed through on the Harrah’s, Riverboat, and Showboat orders that were arranged prior to the TRO.
 

 Despite Frantz’s testimony that she complied with the TRO, JBM alleged that Frantz conspired with Ru and Accornero to avoid the court order by “referring” sales to Ru. Martha Kehn (“Kehn”), a purchasing agent for Boyd Properties, testified that sometime after Frantz left JBM, Frantz contacted her and told her that although Frantz could not take orders, Ru “would take care of anything” she needed. Additionally, Kehn testified that Frantz told her that JBM had an outside supplier of plastic cards.
 

 JBM further alleges that Frantz’s phone records indicate that she did. not comply with the TRO. According to these records, Frantz made 195 calls to Western from her home and 48 calls to Promotional Graphics, another business entity owned by Ru and Accornero, between December 5, 1990, and October 17, 1991.
 

 At the end of 1990, Frantz became an independent contractor, rather than an employee of Plastic, and continued to sell for Western and Promotional Graphics. However, Frantz’s sales for Western were disappointing. Consequently, in April 1991 Plastic allegedly terminated its relationship with Frantz.
 

 
 *462
 
 Thereafter, Frantz tried to establish her own business called Action Graphics. Frantz was unsuccessful and eventually filed for unemployment. When Frantz’s unemployment claim was denied, Plastic agreed to pay her severance until she could find alternate employment. Frantz testified that, during this period of time, she was not attempting to sell cards for Plastic. Plastic, however, paid Frantz $3,000.00 per month allegedly as severance pay until August 1991 and required her to submit Action Graphics’ invoices in order to receive payment. In October 1991, Frantz obtained a retail sales position and ceased working in the plastic card industry.
 

 On May 1, 1991, JBM successfully pursued a preliminary injunction against Frantz. The district court granted the injunction finding that Frantz’s conduct was unethical and violated her duties as an agent for JBM. In addition to seeking an injunction, JBM sued appellants for the following causes of action: (1) misappropriation of confidential information; (2) breach of fiduciary duty; (3) interference with prospective economic advantage; (4) fraud; (5) misrepresentation; (6) unjust enrichment; and (7) civil conspiracy.
 

 At trial, JBM presented expert testimony on damages from its expert witness, Donald McGhie (“McGhie”). McGhie is a certified public accountant and has worked as a chief operating officer at Bally’s Las Vegas. McGhie’s estimation of damages was based on the number of player tracking cards that he calculated were utilized by slot machines in various casinos. McGhie concluded that there was a 10:1 ratio, namely that ten player tracking cards were sold for each slot machine per month. McGhie used invoices from four different casinos to calculate this figure: (1) JBM’s invoices from the Stardust from 1989-94; (2) Faraday’s (one of JBM’s competitors) invoices from the Mirage from 1992-94; (3) Plastic’s invoices from the Showboat, Atlantic City from 1989-90; and (4) Plastic’s invoices from the Riverboat, Reno from 1989-90.
 
 [1]
 

 McGhie testified that his goal in calculating the 10:1 ratio was to find a method by which he could project the lost profit of the thirteen casino accounts that JBM claimed that it lost to Plastic. After coming up with the 10:1 ratio, McGhie used JBM’s 1990 records from the Stardust to calculate a gross profit percentage for
 
 *463
 
 both magnetic and Hollerith plastic cards,
 
 [2]
 
 totaling 18.86% and 34.68%, respectively. McGhie then calculated the losses associated with thirteen casinos that occurred between 1990-95: (1) the Golden Nugget, loss sustained from 1990-95; (2) the Showboat, loss sustained from 1990-94; (3) the Eldorado, the Riverboat, and the Mirage, losses sustained from 1990-95; (4) the Goldstrike, loss sustained from 1990-93; (5) Circus Circus, Excalibur, Slots of Fun, Luxor, Colorado Belle, and the Edgewater, losses sustained in 1993; and (6) the Silver Legacy, Reno, loss sustained in 1995.
 

 Further, McGhie calculated JBM’s losses associated with the reduced cost of Hollerith punching, loss of profit from the sale of machines, the cost of reengineering the plastic card artwork, and the opportunity cost of not getting a new warehouse built. In sum, McGhie testified that the loss of profit from plastic card sales was $411,042.00 and the loss of profits from accounts where there was a reduction in sales price amounted to $566,016.00.
 

 In making the aforementioned calculations, McGhie admitted that he assumed that JBM’s losses resulted from appellants’ conduct. McGhie testified that he did not contact any of the thirteen casinos to see why they had stopped doing business with JBM. JBM alleges, however, that causation can be inferred from appellants’ aforementioned conduct and from Accornero’s deposition, where he stated that he intended to compete against JBM and would do so by taking its customers. Additionally, JBM alleges that causation can be inferred from the fact that Accornero told a former Plastic employee, Terry Malan (“Malan”), that Accornero was going to put JBM out of business by taking all of its customers.
 

 After a ten-day bench trial, the district court entered a judgment in favor of JBM and issued sixty pages of findings of fact and conclusions of law. The district court awarded JBM $222,014.55 for lost profits, but explicitly limited the period of loss to eighteen months from Frantz’s departure. The district court also awarded JBM $47,612.75 for price reduction on plastic cards, business machines, and Hollerith punching services. Further, the district court awarded JBM the following punitive damages against each defendant: (1) Frantz—$4,000.00; (2) Accornero—$50,000.00; (3) Plastic Graphics—$50,000.00; (4) Ru—$25,000.00; and (5) Western Badge—$25,000.00. Finally, JBM was awarded $160,000.00 in attorney fees pursuant to NRS 600A.060 or NRS 18.010(2)(b), $15,779.00 in expenses, and $15,481.31 in costs. This judgment was reduced to satisfy
 

 
 *464
 
 Frantz’s counterclaim for wages owed to her by JBM and to satisfy Plastic’s counterclaim seeking satisfaction of a California judgment against JBM.
 

 Appellants filed this timely appeal alleging numerous instances of error, including that the district court erred in relying on McGhie’s testimony, in awarding attorney fees, and in granting punitive damages. Further, appellants contend that there was insufficient evidence of causation. We agree with appellants that the district court erred in calculating damages and in failing to consider NRS 600A.050(2) in awarding punitive damages. Accordingly, although we affirm the order of the district court in all other respects, we vacate the district court’s award of compensatory and punitive damages, and remand this matter to the district court for recalculation of such damages.
 

 DISCUSSION
 

 Preliminarily, before our discussion of appellants’ contentions on appeal, we address the issue of the parties’ and the district court’s failure to apply the UTSA, specifically NRS 600A.090(2)(b)—a controlling statute that precludes some of the causes of action upon which the district court based its award.
 
 See
 
 Bradley v. Romeo, 102 Nev. 103, 105, 716 P.2d 227, 228 (1986) (“The ability of this court to consider relevant issues
 
 sua sponte
 
 in order to prevent plain error is well established .... Such is the case where a statute which is clearly controlling was not applied by the trial court.”) (citation omitted).
 

 I.
 
 The Nevada Uniform Trade Secrets Act
 

 NRS 600A.090 of the Nevada Uniform Trade Secrets Act, titled “Effects of chapter on other law and remedies,” provides that:
 

 1.
 
 Except as otherwise provided in subsection 2, this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.
 

 2.
 
 This chapter does not affect:
 

 (a)
 
 Contractual remedies, whether or not based upon misappropriation of a trade secret;
 

 (b)
 
 Other civil remedies that are not based upon misappropriation of a trade secret;
 
 or
 

 (c) Except as otherwise provided in NRS 600A.035, criminal sanctions, whether or not based upon misappropriation of a trade secret.
 

 (Emphasis added.) The plain language of NRS 600A.090 precludes a plaintiff from bringing a tort or restitutionary action
 
 *465
 
 “based upon” misappropriation of a trade secret beyond that provided by the UTSA. In interpreting NRS 600A.090, a federal district court has held that a plaintiffs claims for unjust enrichment and unfair competition were precluded by the UTSA since these two claims were duplicative of plaintiff’s claim for misappropriation of trade secrets.
 
 See
 
 Hutchison v. KFC Corp., 809 F. Supp. 68, 70 (D. Nev. 1992).
 

 In light of the plain language of NRS 600A.090 and the holding in Hutchison,
 
 [3]
 
 we conclude that the district court erred in relying on numerous tort and restitutionary causes of action that were explicitly excluded by statute, as they all related to a misappropriation of a trade secret. Specifically, the district court erred in awarding damages based on the following causes of action: (1) misappropriation of confidential information, (2) breach of fiduciary duty, (3) intentional interference with contractual relations, (4) intentional interference with prospective advantage, (5) the tort of breach of the covenant of good faith and fair dealing,
 
 [4]
 
 (6) civil conspiracy, and (7) unjust enrichment. These causes of action would normally be precluded by NRS 600A.090 because they arose from a single factual episode, namely misappropriation of bidding and pricing information.
 

 Although we conclude that the district court erred in grounding liability in common law claims that were displaced by statute, we
 
 *466
 
 farther conclude that this error was harmless.
 
 See
 
 NRCP 61. We determine that this error was harmless in light of the fact that NRS 600A.090 merely codifies the common law elements of misappropriation of confidential information of which JBM pleaded and proffered sufficient circumstantial evidence at trial.
 

 The elements of a misappropriation of trade secrets claim include: (1) a valuable trade secret;
 
 [5]
 
 (2) misappropriation
 
 [6]
 
 of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose.
 
 See
 
 Peter R.J. Thompson,
 
 An Outline of 23 California Common Law Business Torts,
 
 13 Pac. L.J. 1, 19-20 (1981);
 
 see also
 
 NRS 600A.030(2) (defining misappropriation). The determination of whether corporate information, such as customer and pricing information, is a trade secret is a question for the finder of fact.
 
 See
 
 Woodward
 
 *467
 
 Insur., Inc. v. White, 437 N.E.2d 59, 67 (Ind. 1982). Factors to be considered include:
 

 (1) the extent to which the information is known outside of the business and the ease or difficulty with which the acquired information could be properly acquired by others;
 

 (2) whether the information was confidential or secret; (3) the extent and manner in which the employer guarded the secrecy of the information; and (4) the former employee’s knowledge of customer’s buying habits and other customer data and whether this information is known by the employer’s competitors ....
 

 Id.
 
 (citations omitted);
 
 see also
 
 K.H. Larsen, Annotation,
 
 Former Employee’s Duty, in Absence of Express Contract, Not to Solicit Former Employer’s Customers or Otherwise Use This Knowledge of Customer Lists Acquired in Earlier Employment,
 
 28 A.L.R. 3d 7 (1969) (setting forth a comprehensive list of factors for consideration of whether customer information constitutes a trade secret).
 

 We emphasize that not every customer and pricing list will be protected as a trade secret. In Neal v. Griepentrog, 108 Nev. 660, 666, 837 P.2d 432, 435 (1992), this court held that discount lists given by hospitals to various medical providers were not trade secrets, and should therefore be disclosed to the public. The instant customer and pricing information, however, is unlike that in
 
 Neal
 
 because there was testimony below that it was extremely confidential, its secrecy was guarded, and it was not readily available to others because the plastic gaming card industry is highly specialized.
 

 II.
 
 Causation
 

 Appellants contend, however, that there was insufficient evidence to support a finding that appellants misappropriated trade secrets because there was no direct evidence that appellants caused IBM’s damages since not one lost customer testified that it ceased doing business with IBM because of appellants’ conduct. We disagree that such direct evidence is necessary and conclude that there was sufficient circumstantial evidence that appellants misappropriated trade secrets.
 
 [7]
 

 
 *468
 
 Causation is a question for the finder of fact that will not be overturned unless clearly erroneous.
 
 See
 
 Hermann Trust v. Varco-Pruden Buildings, 106 Nev. 564, 566, 796 P.2d 590, 591-92 (1990);
 
 see also
 
 Frances v. Plaza Pacific Equities, 109 Nev. 91, 94, 847 P.2d 722, 724 (1993). Causation may be inferred from the circumstantial evidence presented at trial.
 
 See
 
 Erik Electric Co. v. Elliot, 375 So. 2d 1136, 1138 (Fla. Dist. Ct. App. 1979); Prentice Medical Corp. v. Todd, 495 N.E.2d 1044, 1049-50 (Ill. App. Ct. 1986).
 

 In the instant matter, there was adequate circumstantial evidence to support the district court’s finding that appellants diverted IBM’s trade secrets, thereby causing IBM economic loss.
 

 First, there is sufficient circumstantial evidence that Frantz misappropriated IBM’s trade secrets. The following evidence supports this conclusion: (1) Larsen’s testimony that there were pricing lists missing after Frantz left, and that thereafter IBM lost 40% of its card sales; (2) Frantz’s testimony that she sent out numerous faxes and letters to IBM’s customers stating that she could offer “more competitive pricing” and that she worked for the “direct manufacturer”; (3) Frantz’s phone records indicating that post-TRO Frantz made 195 calls to Western and 48 calls to Promotional Graphics, including several calls to Western’s fax number; and (4) Kehn’s testimony that Frantz contacted her post-TRO and told her that if Kehn needed anything she could contact “Wes.”
 

 Second, there is sufficient circumstantial evidence to support a finding that Accornero and Plastic
 
 [8]
 
 misappropriated IBM’s trade secrets. This evidence includes: (1) Malan’s testimony that Accornero told him that he intended to compete against IBM and
 
 *469
 
 put it out of business by taking all of its customers; and (2) the testimony of another former employee of Accornero, who stated that Accornero had hired him from a competitor and asked him to use his knowledge of his former employer’s pricing structure and customer base to sell for Plastic.
 

 Third, there was sufficient circumstantial evidence that Ru and Western were involved in misappropriating IBM’s trade secrets, including: (1) Kehn’s testimony that Frantz told her that she was unable to take orders but that Kehn “could call Wes and he would take care of anything that—he would help me in anyway that he could”; (2) Ru’s signing of a Western Graphics check payable to Frantz for reimbursement for supplies at a trade show, a show at which Charles testified Frantz solicited IBM’s customers; and (3) Frantz’s numerous post-TRO phone calls and faxes to Western’s office.
 

 Accordingly, we conclude that there was sufficient circumstantial evidence in the record to support the district court’s finding that appellants misappropriated trade secrets, thereby causing IBM damage. We therefore affirm the district court’s conclusion that appellants were liable for IBM’s damages.
 

 III.
 
 Compensatory damages
 

 Appellants next argue that the district court misapplied McGhie’s calculation of damages. We agree.
 

 The district court has ‘ ‘wide discretion in calculating an award of damages, and this award will not be disturbed on appeal absent an abuse of discretion.” Diamond Enters., Inc. v. Lau, 113 Nev. 1376, 1379, 951 P.2d 73, 74 (1997) (citation omitted).
 

 With respect to proof of damages, we have held that a party seeking damages has the burden of providing the court with an evidentiary basis upon which it may properly determine the amount of damages.
 
 See
 
 Mort Wallin v. Commercial Cabinet, 105 Nev. 855, 857, 784 P.2d 954, 955 (1989). Further, we have noted that damages need not be proven with mathematical exactitude, and that the mere fact that some uncertainty exists as to the actual amount of damages sustained will not preclude recovery.
 
 See Mort Wallin,
 
 105 Nev. at 857, 784 P.2d at 955. Finally, this court has held that to meet this burden of proof, a party seeking damages may utilize an expert economist to assist in the calculation of the total damages sustained, provided this expert testimony is not speculative but is instead based on facts known to the expert at the time.
 
 See
 
 Freeman v. Davidson, 105 Nev. 13, 16, 768 P.2d 885, 887 (1989);
 
 see also
 
 Gramanz v. T-Shirts and Souvenirs,
 
 *470
 
 Inc., 111 Nev. 478, 485, 894 P.2d 342, 347 (1995) (holding that it is an abuse of discretion for an expert to give an opinion on facts beyond his knowledge).
 

 In the instant matter, appellants proffered testimony from McGhie, an expert witness on damages, whose calculations were sufficiently grounded in facts known to him at the time. Specifically, McGhie calculated the amount of lost profits for a five-year period, from 1990-95, by applying the percentage of profit that JBM had made from past sales to a reasonable approximation of future sales.
 

 The district court relied on McGhie’s testimony but explicitly limited liability for JBM’s losses to an eighteen-month period beginning when Frantz left JBM in October 1990, and ending in April 1992. In cases where a district court properly limits liability to a specified period of time, it is an abuse of discretion to consider losses outside this time period in calculating damages.
 

 Here, in arriving at total damages, it appears that the district court calculated total damages by applying a pro rata share equivalent to eighteen months of loss for each casino account, regardless of whether the loss occurred within the requisite time period. Eight of the thirteen casino accounts utilized by McGhie in his calculations, however, sustained losses outside the time period of liability found by the district court. These accounts included: Showboat, 1993; Circus Circus, 1993; Excalibur, 1993; Slots of Fun, 1993; Luxor, 1993; Colorado Belle, 1993; Edgewater, 1993; and Silver Legacy, 1995 (collectively hereinafter “the post-1992 losses”). We conclude that the district court abused its discretion by including a pro rata share of the post-1992 losses in its calculation because such damages were sustained outside the time period for which appellants were found liable. We therefore vacate the district court’s award of damages and remand this matter for an evidentiary hearing for recalculation of damages that actually occurred solely within the eighteen-month time period from October 1990 to April 1992.
 

 IV.
 
 Punitive damages
 

 Appellants next contend that the district court erred in awarding punitive damages against Ru, Western, and Plastic because there was no evidence of oppression, fraud, or express or implied malice. Although we conclude that there was substantial evidence in the record to support the district court’s finding that appellants
 
 *471
 
 acted maliciously,
 
 [9]
 
 we reverse the district court’s grant of punitive damages so that it may consider NRS 600A.050(2).
 

 NRS 600A.050(2) provides that:
 

 If willful, wanton or reckless misappropriation or disregard of the rights of the owner of the trade secret exists,
 
 the court may award exemplary damages in an amount not exceeding twice the award made under subsection 1.
 

 Pursuant to the plain language of NRS 600A.050(2), a punitive damages award under the UTSA is limited to two times the compensatory damages award. Because we have vacated the district court’s award of compensatory damages for recalculation, we necessarily vacate the punitive damages award so that the district court can ensure that the parameters of NRS 600A.050(2) are satisfied.
 

 V.
 
 Attorney fees
 

 Appellants next contend that the district court erred in awarding attorney fees without a statutory basis for doing so. We disagree.
 

 A district court’s award of attorney fees will not be disturbed on appeal absent a manifest abuse of discretion.
 
 See
 
 Nelson v. Peckham Plaza Partnerships, 110 Nev. 23, 26, 866 P.2d 1138, 1139-40 (1994). It is an abuse of discretion to award attorney fees without a statutory basis for doing so.
 
 See
 
 Rowland v. Lepire, 99 Nev. 308, 315, 662 P.2d 1332, 1336 (1983).
 

 In the case at bar, the district court awarded JBM $160,000.00 in attorney fees pursuant to NRS 18.010(2)(b), or alternatively, under NRS 600A.060. We conclude that the district court abused its discretion in relying on NRS 18.010(2)(b) as a statutory basis for its award. We further conclude, however, that this error was harmless because the district court’s grant of attorney fees was proper under NRS 600A.060.
 

 
 *472
 
 A.
 
 NRS 18.010(2) (b)
 

 The plain language of NRS 18.010(2)(b) and our case law interpreting it do not permit an award of attorney fees for acting maliciously or engaging in unacceptable discovery tactics.
 
 [10]
 

 See
 
 Chowdhry v. NLVH, Inc., 109 Nev. 478, 851 P.2d 459 (1993); Semenza v. Caughlin Crafted Homes, 111 Nev. 1089, 901 P.2d 684 (1995). Rather, NRS 18.010(2)(b) allows an award of attorney fees to the prevailing party when a party has alleged a groundless claim that is not supported by any credible evidence at trial.
 
 See
 
 Allianz Ins. Co. v. Gagnon, 109 Nev. 990, 996, 860 P.2d 720, 724 (1993).
 

 Our review of the record reveals no evidentiary basis to support the district court’s explicit finding that appellants asserted frivolous counterclaims. A counterclaim cannot be frivolous as a matter of law when the party asserting the counterclaim actually prevails on the counterclaim. Here, both Frantz and Plastic prevailed on their counterclaims, and the district court reduced JBM’s judgment to satisfy Frantz’s counterclaim for lost wages and Plastic’s counterclaim ¡for payment of a California judgment against JBM.
 

 Accordingly, because appellants did not assert a groundless counterclaim, the district court abused its discretion in awarding attorney fees pursuant to NRS 18.010(2)(b).
 

 This error was harmless, however, because there was a proper statutory basis for the district court’s award of attorney fees—NRS 600A.060(3). NRS 600A.060(3) provides that where “[w]illful and malicious misappropriation exists, the court may award reasonable attorney’s fees to the prevailing party.” Here, the district court found that malicious misappropriation existed. Therefore, attorney fees were proper pursuant to NRS 600A.060(3).
 

 CONCLUSION
 

 We conclude that the district court erred in calculating damages. We therefore vacate the district court’s award of compen
 
 *473
 
 satory and punitive damages and remand this matter for an evidentiary hearing for the purpose of recalculating damages. All other portions of the judgment entered below are affirmed.
 

 [1]
 

 Specifically, the card ratio was based on the following time periods and numbers: From 1992-94, Faraday sold 693,000 cards to the Mirage, averaging eight cards per slot machine. From 1989-94, JBM sold 1.5 million cards to the Stardust, averaging ten cards per slot machine. From 1989-91, over a seventeen-month period, Plastic sold 96,000 cards to the Riverboat, averaging twelve cards per slot machine. From 1989-91, over a sixteen-month period, Plastic sold 334,000 cards to the Riverboat, averaging twelve cards per slot machine.
 

 [2]
 

 A Hollerith card is a card containing customer information in a binary code that is punched with rectangular holes through a plastic card. A magnetic card is a card that contains customer information in a magnetic strip.
 

 [3]
 

 We note that our approval of
 
 Hutchison
 
 is not without limitation. Indeed, we do not agree that the UTSA provides a blanket preemption to all claims that arise from a factual circumstance possibly involving a trade secret. There may be future instances where a plaintiff will be able to assert tort claims, including intentional interference with prospective advantage and intentional interference with existing contract, that do not depend on the information at issue being deemed a trade secret, and thus are not precluded by the UTSA.
 
 See
 
 Powell Products, Inc. v. Marks, 948 F. Supp. 1469, 1474 (D. Colo. 1996). The factual circumstances underlying the claims in this matter, however, are completely dependent on the facts concerning misappropriation of trade secrets, and are therefore barred by the UTSA.
 

 [4]
 

 We note that JBM’s cause of action for breach of the implied covenant of good faith and fair dealing would not be barred provided it was grounded in contract. An implied covenant of good faith and fair dealing exists in every Nevada contract and essentially forbids arbitrary, unfair acts by one party that disadvantage the other.
 
 See
 
 Consolidated Generator v. Cummins Engine, 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (1998); Overhead Door Co. v. Overhead Door Corp., 103 Nev. 126, 128, 734 P.2d 1233, 1235 (1987).
 

 NRS 600A.090(2)(a) explicitly provides that contractual remedies, even those based upon misappropriation of trade secrets, are not displaced by the UTSA. Accordingly, we conclude that the district court did not err in awarding damages based on the contractual remedy of breach of the covenant of good faith and fair dealing.
 

 [5]
 

 NRS 600A.030(5) defines a trade secret as:
 

 information, including, without limitation, a formula, pattern, compilation, program, device, method, technique, product, system, process, design, prototype, procedure, computer programming instruction or code that:
 

 (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use; and
 

 (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
 

 [6]
 

 Misappropriation is further defined by statute. NRS 600A.030(2) provides that:
 

 “Misappropriation” means:
 

 (a) Acquisition of the trade secret of another by a person by improper means;
 

 (b) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
 

 (c) Disclosure or use of a trade secret of another without express or implied consent by a person who:
 

 (1) Used improper means to acquire knowledge of the trade secret;
 

 (2) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
 

 (I) Derived from or through a person who had used improper means to acquire it;
 

 (II) Acquired, under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
 

 (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
 

 (3) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.
 

 [7]
 

 In so concluding, we recognize that there is legal support holding to the contrary that requires direct evidence of causation, such as testimony of clients lost, to establish causation in employee disloyalty cases.
 
 See
 
 McCallister Co. v. Kastella, 825 P.2d 980, 984 (Ariz. Ct. App. 1992);
 
 *468
 
 Bancroft-Whitney Co. v. Glen, 411 P.2d 921 (Cal. 1966). However, we explicitly disapprove of such a requirement based on our belief that an existing business is entitled to compensation in instances where indirect circumstantial evidence shows that its competitors harmed it through unfair and illegal business tactics.
 

 [8]
 

 Appellants also contend that compensatory and punitive damages should not have been assessed against the corporations, Plastic and Western, absent evidence of corporate misconduct. We disagree. We have previously held that a corporation is liable for damages committed by an agent employed in a managerial capacity acting within the scope of employment as a matter of law.
 
 See
 
 Smith’s Food & Drug Cntrs. v. Bellegarde, 114 Nev. 602, 610, 958 P.2d 1208, 1215 (1998). Because Accornero and Ru are officers and managers of Plastic and Western, respectively, Accornero’s and Ru’s tortious acts committed within the scope of their employment are attributable to these corporations as a matter of law.
 

 [9]
 

 The following evidence supported the district court’s finding of malice: (1) testimony that Frantz took IBM’s confidential customer and pricing information; (2) testimony that Frantz sent faxes to all of JBM’s customers announcing that JBM did not manufacture its own cards and that she could offer “competitive” pricing; (3) testimony that Frantz did not comply with the TRO; (4) testimony that Accornero planned on taking all of JBM’s customers in violation of his oral promise not to compete with JBM; and (5) testimony that Frantz contacted Kehn in violation of the TRO and “referred” her to Ru.
 
 See
 
 NRS 42.005;
 
 see also
 
 Paullin v. Sutton, 102 Nev. 421, 423, 724 P.2d 749, 750 (1986) (in reviewing the factual evidence supporting a punitive damages award, this court will presume all evidence favorable to the prevailing party and draw all reasonable inferences in the prevailing party’s favor).
 

 [10]
 

 NRS 18.010(2) provides:
 

 In addition to the cases where an allowance is authorized by specific statute, the court may make an allowance of attorney’s fees to a prevailing party:
 

 (b) Without regard to the recovery sought,
 
 when the court finds that the claim . . . was brought without reasonable ground or to harass the prevailing party.
 

 (Emphasis added.)