MARC FINKEL, an Individual, Appellant, v. CASHMAN PROFESSIONAL, INC., a Nevada Corporation; CASHMAN ENTERPRISES, INC., a Nevada Corporation; and CASHMAN PHOTO ENTERPRISES OF NEVADA, a Nevada Corporation, Respondents.

No. 54520

MARC FINKEL, an Individual; IQ VARIABLE DATA, LLC, a Nevada Corporation; RICHARD CLARK, an Individual; and MFRC VENTURES, LLC, dba INFLUENT SOLUTIONS, a Nevada Corporation, Appellants, v. CASHMAN PROFESSIONAL, INC., a Nevada Corporation; CASHMAN ENTERPRISES, INC., a Nevada Corporation; and CASHMAN PHOTO ENTERPRISES OF NEVADA, a Nevada Corporation, Respondents.

No. 55377

March 1, 2012                                              270 P.3d 1259

[Rehearing denied April 27, 2012]

*Law Office of Daniel Marks* and *Adam Levine, Daniel Marks,* and *Christopher L. Marchand,* Las Vegas, for Appellants.

*Kravitz, Schnitzer, Sloane & Johnson, Chtd.,* and *Michael B. Lee* and *Martin J. Kravitz,* Las Vegas, for Respondents.

Before SAITTA, C.J., HARDESTY and PARRAGUIRRE, JJ.

## OPINION

By the Court, PARRAGUIRRE, J.:

In this appeal, we review two district court orders: one granting a preliminary injunction to enforce restrictive provisions in a consulting agreement (the Agreement) and to prevent likely violations of Nevada's Uniform Trade Secrets Act, and the other refusing to dissolve that preliminary injunction after the Agreement had been terminated. Because substantial evidence supports the district court's findings that appellant likely breached the Agreement and violated Nevada's Uniform Trade Secrets Act, we affirm the district court's order granting respondents' request for preliminary injunctive relief. However, upon termination of the Agreement, the district court should have granted appellant's motion to dissolve the injunctive provisions that were grounded on findings that appellant likely breached the Agreement. With regard to the alleged trade secret violations, NRS 600A.040(1) requires the district court to make findings as to the continued existence of a trade secret and to what constitutes a "reasonable period of time" for maintaining an injunction under Nevada's Uniform Trade Secrets Act. Because the district court failed to make these findings, we reverse the district court's second order and remand to the district court for further proceedings regarding the extent that the injunctive provision related to likely violations of the Trade Secrets Act should continue to remain in effect.

### FACTS AND PROCEDURAL HISTORY

Beginning in 2001, appellant Marc Finkel was employed in various executive positions at respondent Cashman Professional, Inc., which is affiliated with respondents Cashman Enterprises, Inc., and Cashman Photo Enterprises of Nevada (collectively, Cashman). During his employment, Finkel performed various tasks designed to expand and streamline Cashman's Las Vegas-based wedding photography business. Among other things, Finkel designed

business software, negotiated sales contracts with customers, developed new sales strategies, drafted employment agreements, created training programs, and implemented new management techniques for the business.

Cashman went to great lengths to keep the above aspects of its business confidential. In particular, Finkel was one of only four people with access to Cashman's contracts, which were kept under lock and key to thwart attempts of underbidding by competitive companies.

Accordingly, when Finkel left his employment with Cashman in 2008, Cashman and Finkel entered into the Agreement, which, in large part, was designed to maintain the confidentiality of this information following Finkel's departure. The Agreement provided that Finkel would serve as a consultant to Cashman and would abide by several restrictive covenants in exchange for certain compensation. The restrictive covenants prohibited Finkel from engaging in a competing business, disparaging Cashman, soliciting Cashman's employees, and disclosing Cashman's confidential information.

In early 2009, Finkel purchased a printing company called IQ Variable Data, LLC (IQ), which he renamed as Influent Solutions. According to the parties, IQ was the only printing company in Las Vegas that could provide overnight printing of wedding photo books, and Cashman's photography business relied on IQ when overnight printing services were required. Finkel continued to provide the same services as IQ through Influent Solutions, and in doing so, he enlisted several Cashman employees to help establish his business. Finkel also approached at least two of Cashman's customers and solicited them to move their entire wedding photo and print production to Influent Solutions.

Detecting a threat to its business interests, Cashman filed a motion in the district court alleging breach of the Agreement and, in part, seeking a preliminary injunction to enforce the Agreement's restrictive covenants. The district court granted Cashman's request for a preliminary injunction in August 2009, concluding that Finkel had likely violated several provisions in the Agreement and misappropriated trade secrets in violation of Nevada's Uniform Trade Secrets Act, and that Cashman would suffer irreparable injury absent the issuance of an injunction. The preliminary injunction prevented Finkel from engaging in a competing business, making disparaging remarks about Cashman, soliciting Cashman's employees, and disclosing Cashman's confidential information. It further enjoined Finkel from misappropriating Cashman's trade secrets.

Finkel appealed from the preliminary injunction order and later informed Cashman that he was exercising his right to terminate the Agreement. Because the restrictive covenants were only applicable while the Agreement was in effect, Finkel then filed a mo-

tion to dissolve the preliminary injunction upon termination of the Agreement. After a hearing, the district court entered an order in January 2010, denying Finkel's motion to dissolve the injunction, finding that termination of the Agreement did not end the district court's authority to protect Cashman from an unfair competitive scenario. Finkel appealed from the order refusing to dissolve the injunction, and this court consolidated the two matters for resolution.

## DISCUSSION

On appeal, Finkel first argues that the district court abused its discretion by issuing the preliminary injunction because substantial evidence does not support that Cashman would suffer irreparable harm and that Cashman would likely succeed in establishing that Finkel had breached the Agreement or misappropriated trade secrets.[1] As explained below, we disagree.

*The order issuing the preliminary injunction was supported by substantial evidence*

''A preliminary injunction is available when the moving party can demonstrate that the nonmoving party's conduct, if allowed to continue, will cause irreparable harm for which compensatory relief is inadequate and that the moving party has a reasonable likelihood of success on the merits.'' *Boulder Oaks Cmty. Ass'n v. B & J Andrews*, 125 Nev. 397, 403, 215 P.3d 27, 31 (2009).

*Standard of review*

This court reviews a district court's issuance of a preliminary injunction for an abuse of discretion. *Guerin v. Guerin*, 114 Nev. 127, 134, 953 P.2d 716, 721 (1998), *abrogated on other grounds by Pengilly v. Rancho Santa Fe Homeowners*, 116 Nev. 646, 648-49, 5 P.3d 569, 570-71 (2000). ''A decision that lacks support in the form of substantial evidence is arbitrary or capricious and,

---

[1]Finkel makes two alternative arguments. First, he argues that Cashman failed to provide him the contractually mandated notice and opportunity to cure before enforcing the Agreement. Although such actions would be required prior to termination, the Agreement does not mandate that notice and an opportunity to cure be given before an injunction is sought. Thus, we conclude that this argument lacks merit.

Finkel also argues that the preliminary injunction should be held void for vagueness, claiming that he could not ascertain which actions were prohibited. We find this argument unpersuasive, as the district court made detailed findings in enjoining Finkel's actions when issuing the preliminary injunction, and we conclude that he was sufficiently informed as to which acts were prohibited.

therefore, an abuse of discretion." *Stratosphere Gaming Corp. v. Las Vegas*, 120 Nev. 523, 528, 96 P.3d 756, 760 (2004) (quotation omitted). "Substantial evidence has been defined as that which a reasonable mind might accept as adequate to support a conclusion." *McClanahan v. Raley's, Inc.*, 117 Nev. 921, 924, 34 P.3d 573, 576 (2001) (quotations omitted).

### *Irreparable harm and likelihood of success on the merits*

Finkel argues that the record lacks substantial evidence to support the district court's conclusion that Cashman would likely succeed on the merits on its breach of contract and related claims or that it would suffer irreparable harm absent the issuance of the injunction.

This court has held in the context of an appeal from an order granting an injunction that "acts committed without just cause which unreasonably interfere with a business or destroy its credit or profits, may do an irreparable injury." *Sobol v. Capital Management*, 102 Nev. 444, 446, 726 P.2d 335, 337 (1986). Here, the district court found that Finkel likely competed with Cashman, solicited Cashman's employees, disparaged Cashman, disclosed Cashman's confidential information, and misappropriated Cashman's trade secrets.

Contrary to Finkel's arguments, substantial record evidence supports the district court's conclusions. First, the Agreement restricted Finkel's ability to engage in a competing business, defined in part as any commercial photography or related service offered by Cashman, whether performed internally or by an *outside service*. It is undisputed that Finkel proceeded to acquire and operate the only vendor for wedding albums who could provide next-day printing in the relevant area, and that IQ had performed as an outside-service provider for Cashman in the past. Finkel argues that this fact is insufficient to show that he was participating in a competing business because Influent Solutions offered a variety of other commercial printing services. However, this does not undermine the district court's conclusion that Influent Solutions was in competition with Cashman, especially in light of Finkel's admission that he approached several of Cashman's customers, urging them to move their business to Influent Solutions.

Second, the Agreement prohibited Finkel from making any type of disparaging or derogatory remarks regarding Cashman. The record indicates that Finkel repeatedly violated this clause by referring to Cashman executives as untrustworthy, swindling "snake[s]," and other similar remarks.

Next, the Agreement restricted Finkel from inducing or attempting to induce any Cashman employee to leave Cashman.

Here, the record indicates that Finkel likely violated this condition, as at least four Cashman employees visited Influent Solutions while still employed by Cashman, and Finkel made more than 155 calls lasting a total of 1,104 minutes to those employees. Also, Finkel enlisted one Cashman employee to set up his telephone and computer network and another employee to arrange a business meeting with one of Cashman's customers. Although Finkel argues that he did not violate the Agreement, since he only temporarily employed these individuals, the Agreement prohibited any attempt to induce a Cashman employee.

Finally, the Agreement prohibited Finkel from disclosing any nonpublic information, including information regarding Cashman's plans, pricing, customers, processes, or other data of any kind. The record supports that Finkel identified several of Cashman's customers in his online biography and that he described his invention of Cashman's point-of-sale operating system. Also, Finkel informed at least one outside party of Cashman's confidential pricing structures and marketing plans.

This is the precise sort of conduct that could cause a business irreparable harm. *Sobol*, 102 Nev. at 446, 726 P.2d at 337 (determining that where a person has "interfere[ed] with the operation of a legitimate business by creating public confusion, infringing on goodwill, and damaging reputation in the eyes of creditors," it may result in irreparable harm). Therefore, substantial evidence supported the district court's conclusion that Finkel's conduct likely breached multiple provisions of the party's Agreement and, if true, would likely cause irreparable harm to Cashman.

With respect to the district court's finding that Finkel likely misappropriated trade secrets, Finkel argues that any information that he may have used was not a "trade secret." We disagree. Nevada's Uniform Trade Secrets Act, NRS Chapter 600A, provides that the "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined." NRS 600A.040(1). Broadly defined, a trade secret is information that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public," as well as information that "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." NRS 600A.030(5)(a)-(b). Whether information is a trade secret generally is a question of fact. *See Frantz v. Johnson*, 116 Nev. 455, 466, 999 P.2d 351, 358 (2000). Factors to consider include:

> (1) the extent to which the information is known outside of the business and the ease or difficulty with which the ac-

quired information could be properly acquired by others; (2) whether the information was confidential or secret; (3) the extent and manner in which the employer guarded the secrecy of the information; and (4) the former employee's knowledge of customer's buying habits and other customer data and whether this information is known by the employer's competitors . . . .

*Id.* at 467, 999 P.2d at 358-59 (quotation omitted).

Here, the district court found that Finkel acquired an intimate knowledge of Cashman's confidential information while employed as an executive for the company. This included Cashman's contracts, customers, processes, prices, and other business-related confidential information. Finkel acknowledged to the district court that confidential trade secrets would include: "costs; discounts; future plans; business affairs; processes; . . . technical matters; customer lists; product designs; and, copyrights." While Finkel's admission is not necessarily dispositive of an item's trade-secret status, it may be considered as a factor weighing towards such classification.[2] *See Frantz*, 116 Nev. at 467, 999 P.2d at 358-59.

In addition to Finkel's admission, the parties' treatment of the above items tends to support their classification as trade secrets. *Frantz*, 116 Nev. at 466, 999 P.2d at 358. The record indicates that pricing schemes were kept confidential, the point-of-sale software was not shared with anyone outside the business, and Cashman required its employees to keep business-related information confidential. Moreover, Cashman went to extreme measures to protect its customer information, as only four people had access to its contracts and customer data. Thus, substantial evidence supports the district court's conclusion that the information allegedly misappropriated by Finkel would likely be confidential trade secrets and that such misappropriation could result in irreparable harm, making injunctive relief appropriate. *See Saini v. International Game Technology*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006) ("[D]isclosure of confidential information or trade secrets" creates serious harms, "which are not readily addressed through payment of

---

[2]Although Finkel admitted and the district court concluded that "customer lists" were confidential trade secrets, Finkel now argues that the identities of Cashman's well-known customers should not have been deemed confidential. *See Cambridge Filter v. Intern. Filter Co., Inc.*, 548 F. Supp. 1301, 1306 (D. Nev. 1982) ("Where the plaintiff's customers are known to competitors as potential customers, the plaintiff's customer list is not a trade secret."). Although it is possible that not all of Cashman's relationships would have qualified as trade secrets, we decline to address this matter based on the district court's finding that Finkel likely misappropriated other protected information. Instead, we instruct the district court on remand to specify which business relationships are to be afforded trade-secret status.

economic damages, [and] are sufficient to meet the irreparable injury requirement for a preliminary injunction.'').

*Upon termination of the Agreement, the district court should have dissolved the preliminary injunction as it applied to the restrictive covenants contained in the Agreement*

Finkel argues that the district court erred in refusing to dissolve the injunction despite termination of the Agreement. We agree with Finkel that the injunctive provisions that restricted his business activities based on his likely violations of the Agreement should have been dissolved once the Agreement was no longer enforceable. However, we do not necessarily agree that the injunctive provisions that applied to prevent likely trade secret violations should have been dissolved.

Although this is an issue of first impression in Nevada, the majority of courts that have considered this matter have declined to enforce an agreement not to compete after the period set forth in the agreement had expired. *Economics Laboratory, Inc. v. Donnolo*, 612 F.2d 405, 408 (9th Cir. 1979); *see also id.* at 409 (''There is no reason . . . to enforce a covenant which by its terms is no longer in effect.'').

We agree with the Ninth Circuit's reasoning, and therefore conclude that the district court abused its discretion by denying Finkel's motion to dissolve the injunction to the extent that it restricted Finkel's business activities based on the terminated Agreement, as there was no longer any basis for enforcing that portion of the injunction.[3] Accordingly, we reverse the district court's second order to the extent that it maintains the injunctive provisions relating to Finkel's alleged breach of the Agreement and remand with instructions to grant Finkel's motion to dissolve as to this portion of the injunction.

This brings us to the remaining portion of the injunction, which was based on Finkel's likely trade-secret violations. An injunction entered under Nevada's Uniform Trade Secrets Act ''must be terminated when the trade secret has ceased to exist, but the injunc-

---

[3]The district court seems to have recognized its error, as it subsequently purported to modify its second order by removing the injunctive provisions that were based on the Agreement in an order entered in February 2010. However, the district court lacked jurisdiction to modify the order because Finkel had already filed this appeal. *See Rust v. Clark Cty. School District*, 103 Nev. 686, 688, 747 P.2d 1380, 1382 (1987) (''a timely notice of appeal divests the district court of jurisdiction to act'').

tion may be continued for an additional reasonable period of time to eliminate commercial or other advantage that otherwise would be derived from the misappropriation." NRS 600A.040(1).

Here, the district court maintained the preliminary injunction on the independent basis that Finkel had likely misappropriated Cashman's trade secrets. While this may be a valid ground for maintaining a preliminary injunction beyond the termination date of the parties' agreement, we conclude that additional findings were required by the district court. First, NRS 600A.040(1) requires that an injunction be terminated when the trade secret no longer exists. Here, the district court should have made findings as to the extent that Cashman's contracts, customer lists, process, and prices remained protected as trade secrets. Assuming that trade secrets are found to exist, an injunction may only be extended for a "reasonable period of time" pursuant to NRS 600A.040(1). Thus, the district court should also have articulated a duration for extending the injunction pursuant to statute.

This conclusion is consistent with the comments to the Uniform Trade Secrets Act, which indicate that "an injunction should last for as long as is necessary, but no longer than is necessary, to eliminate the commercial advantage or 'lead time' with respect to good faith competitors that a person has obtained through misappropriation." Unif. Trade Secrets Act § 2 cmt., 14 U.L.A. 620 (2005). Accordingly, such a determination should be made on a case-by-case basis by the district courts.

Therefore, we also reverse the part of the district court's January 2010 order in which it maintained the injunctive provisions based on Finkel's alleged misappropriation of trade secrets. On remand, the district court shall reconsider to what extent the injunctive provision should be maintained under NRS 600A.040(1) in light of this opinion.

## CONCLUSION

Because substantial evidence exists to support the district court's decision to issue the preliminary injunction, we affirm the district court's first order. However, because the district court improperly relied on the terminated Agreement in declining to dissolve the injunction that prohibited Finkel from conducting business activities that likely violated the Agreement, and because the district court failed to make findings as to the continued existence of a trade secret and for what constitutes a "reasonable period of time" under NRS 600A.040(1), we reverse the district court's second order and remand for further proceedings consistent with this opinion.

SAITTA, C.J., and HARDESTY, J., concur.